Mr. Rawls, good afternoon to you. Welcome, please proceed. Thank you, Your Honor. Good afternoon, Your Honor. My name is John Rawls, and I represent on which ADT is entitled to relief in connection with the matter heard by the board first. This isn't the review of your claim by the contracting officer, and it's not the appeal to the board. The only issue before us, I think, is whether you can show that the board, in its decision, committed reversible error. That's right. Well, what was the reversible error? We think there was reversible error in the failure to recognize the legal principles related to offer and acceptance that apply to the case. That's a legal issue that should probably be— Well, it's too inexact to be helpful to say that they ignored the law of offer and acceptance. What specifically was ruled by the board that was contrary to law? Specifically, it would be the construction of a language in ADT's proposal that was accepted by the government. It is that construction of that language, which, by the government's admission, is part of the contract. That should be properly reviewed, de novo. But the map has, in the upper left-hand corner, no borrow areas available on base. How do you get around that? I get around it in a couple of ways. First, we know that both statements, the statement on the vicinity map note and the statement in ADT's proposal, are both part of the contract. We know that. And so we have to address that and deal with that. And this Court's precedents have said that all— Well, wait a minute. It's not a question of precedents. The contract provides for what you do when there's a conflict between one provision of the contract documentation and another. Well, obviously, Your Honor is referring to the order of precedence clause. And there, I think— Are you saying it's inapplicable here? I am saying—well, I'm saying we have to look at the order of precedence clause. Well, when you look at it, it says that the solicitation governs if there's a contradiction between what it requires and what some later piece of paper says. I think the case of most value here is Apollo, which is a Court of Federal Claims case. And what that Court said was when we consider an order of precedence clause, we have to make sure that it's apples to apples. And the two statements here were not apples to apples. We have the vicinity map note, which contains no mandatory language. It's a statement of fact. There are no borrow areas available on base. And then we have the statement in ADT's proposal, which contains three sentences and says we assumed that we could use on-site material as film material. Was that a statement of fact? It was not a statement of fact. It was not a statement of fact. It was a statement of this is how we're going to do the job. That's not a statement of fact? Of course it is. Well, okay, fair enough. I haven't thought about it in those terms. Now, what puzzles me about your position, counsel, is you seem to reject the proposition that there was a mistake in this contract. When it seems to me the only winning argument you have is that there is a mistake. So help me understand exactly how you and the board saw this case. I'll do that. And I agree with your analysis up to the point of isn't it an essential element for me to say I made a mistake? If you look at Cook and Straga, which are two board presidents that addressed this precise question, giving relief for government overreaching in the event of accepting the government contractor's proposal. In both of those cases, Straga and Cook, the contractor said I made no mistake. They argued vociferously that my reading of the contract was correct. And Straga is very, very strong analytically in this point because what the board in that case said was we disagree with you, Mr. Straga. We don't agree with your interpretation of the contract language, but we're still going to give you relief based on this mistake theory. So I don't think I have to stand up and say before the board I made a mistake in order to get in that. Well, I would have thought the mistake you made was in the way you offered the proposal. On the one hand, you certified in writing that you complied with the RFP, with the government's request for submissions. And on the other hand, you included in your actual offer a factual statement that was contrary to your own certification. It seems to me that was a clear mistake on your part, wasn't it? Well, I think – And you can't have it both ways, so you had to have made – one or the other had to be a mistake. Your Honor, with respect, I think I can maintain that I made no mistake. My client maintains they made no mistake. But in hindsight, no contractor wants to go through this, so they made a mistake in that sense. None of us want to have to – we just want to do the job, and we want to perform the work in the way that we said. But if you look at those precedents, Straga and Cook as examples, in both of those cases the contractor steadfastly maintained that he had made no mistake. And yet the court found relief finding that, well, we disagree with you. We think you did make a mistake. You mistakenly interpreted your contractual obligations. But in that case, you still have satisfied the prerequisites. Because here, the government, they're the ones that have that last chance. They had our proposal. There's a question in our proposal. And when they accepted it – this is an RFP, which is absolutely fundamental to the analysis. When they accepted our proposal, they answered that second sentence, that question, by saying yes. That was a reasonable interpretation. Well, how can they do that and be fair to other competitors who are trying to bid if they're going to change what the solicitation said, which is get the fill elsewhere to allow you to get the fill at the airbase? Because then every other bidder is entitled to re-bid against the change requirement. But if we do it your way, all other bidders are denied the chance to be on a level playing field. They won't know that the location of the dirt has now been made easier. And if that's right, that the other proposers should have been given the chance to make proposals on a level playing field, then that's what the government should have done. But that's not what happened here. Yeah, but you knew that they didn't do that. Why weren't you required to be sure that the departure you were apparently trying to propose to go from off-site dirt to on-site dirt was implemented by the CO by issuing a revision to the solicitation and letting all bidders re-bid based on the new requirement? We didn't know. Of course you knew because you would have gotten the revised notice along with every other bidder if the CO had accepted your departure, your shift of the locus of the dirt. All of you would have been advised because you would have all received a changed solicitation and the process would have started all over again. So you knew that didn't happen. We did, but we didn't know the content of the other proposals. You didn't need to know the content of the other proposals. The solicitation remains unchanged unless and until the contractor re-issues it with a change. Your Honor, if the contracting officer should have done that, if what she should have done is said, Hey, we've got… I'm not talking about what she should have done. I'm talking about what you should have done. You should have waited to see whether the change was made in the solicitation. If it isn't made in the solicitation, then you should conclude that your proposed departure has been rejected. Your Honor, and I would draw the Court's attention to the government's answer. It's corrected answer, which is at JA 159, and the important language is at JA 154, where it not only admits that it accepted our proposal, it not only admits that it became part of the contract, but it agrees with the way that we are characterizing our proposal at paragraphs 7 and 8. And so with respect, I don't think we should have known that something was up. What we knew is that the government had accepted our proposal, and we believed that we could go out and perform the work by using on-site material. Specifically, paragraph 7 says, ADT, this is our allegation, ADT submitted its proposal and told the government that its proposal was based on using on-base borrow, that is, on-base soil as fill. ADT also told the government that a requirement to import soil from an off-base location would have a cost impact. And yet the government accepted that. With respect, if the contracting officer had reopened it up for a new round of proposals, we may have had an argument at that point, in a bid protest type of setting, that that was improper because this was something that we spotted that no one else spotted. This was a technical innovation. This was a competitive advantage. Yeah, yeah, yeah, but it contradicted what the solicitation required you to do, which was to get the dirt from off-site. Well, I... It removed the requirement of the solicitation that everyone else responded to and was never told that it had been removed. But the problem before the court is to grapple with both of those statements, because both are part of the contract. Not if you didn't follow required procedures. Well, but there's all kinds of procedures in the RFP also, because this is not an invitation for a bid, where the government can waive technical deficiencies. Perhaps they thought it was a technical deficiency. We're encouraged to come up with cost savings proposals. That is also in the solicitation. I wasn't criticizing the worth of your suggestion. Everybody loved it. The Air Force loved it, and it was better for you. The question is whether you took the steps you needed to take under the law to protect your position. And it's hard for me to see how you did that when you didn't wait to see the contracting officer reissue the solicitation to all the bidders, removing the requirement about the location of Phil. If I may, Your Honor, if we look at the Ms. Frazier's affidavit, which was submitted below, JA 182, paragraph 10. She's the contracting officer. She did not look at the proposals at all, but she's the contracting officer. And what she says is, had I known of the contingency, that's her characterization, had I known of it, I would have entered into negotiations with the appellant and advised it that it would have to comply with the note on drawing G12, which is the vicinity map, and remove the contingency for on-base borrow. Had she known, well, the government knew. Counsel, I get easily confused. You'll have to forgive me for that. Help me understand a few simple issues. First of all, do you think there was an offer and an acceptance, i.e., a contract in this case between you and the government? Yes, Your Honor. What was the term of that contract vis-a-vis the on-site dirt versus the off-site dirt, as you understand it? I'm sorry. That we were allowed to use on-site material if it was found to be suitable and then in accordance with the guidelines respecting soil work that are set forth in the specifications. Why do you think that was the contract when the government doesn't think that was the contract? What is it that makes you think that was your contract? Because I set forth in my proposal, and I'm allowed in an RFP setting. It doesn't have to be a mirror image of the solicitation because it's an RFP. It's an offer, and they accepted my offer. How did they accept your offer? Didn't they accept your offer because you had accepted their offer? No, no. It's the solicitation. You unequivocally said, we will do this job, and you certified that you'll do the job, right? According to the terms of the RFP. So the government assumes you're complying with the vicinity method. Your Honor, there's all kinds of statements in the RFP that encourage us and encourage the offerors to come up with innovative proposals. No, that's not the question. The question, counsel, is did you or did you not agree in writing that you had the government didn't make you an offer. The government put out a proposal. You made the offer. That's right. The government, you tell us, accepted your offer. That's right. Did you not in your offer check off the little box or sign the form that said this offer is in strict accord with the RFP? It's block 17. Yeah, block 17. You did. You don't check it. It's not always you check, but yes. You did. Yes, Your Honor. In that case, there was a contract based on the RFP. Your Honor, we have a proposal. Was there or was there not a contract based on the RFP? There was, and you have to read them all together. And my proposal also became a contract document. You have to, as the court said in WPC, which is one of these zone agreements. Well, wait a minute. How many contracts were there here? How many contracts? There was one. There was one. Was the contract the one that you executed in which in the form 17 you said, yes, this comports with the RFP, which calls for off-site dirt, or was the contract the one you submitted in which you said, the assumption is I'm using on-site dirt? Which was the contract? I don't agree with your characterization of Block 17. The answer is all. That there's one contract, and all of those statements are part of the contract, and so it becomes a problem of contract interpretation. It's not unusual to have a contract dispute where one party is pointing to one clause they like and one party is pointing to another clause they like and that supports their position. That's exactly what we have here, and it's no different. Is it your view that the order of precedence clause can't apply to resolve the inconsistency as to the location of the dirt? I think when it comes to offering acceptance, that's an open question in my mind. There's been no opinion that I've read or found in research that says one where it applies an order of precedence clause to an RFP setting and the acceptance of a proposal. But the court does not have to get to that point because what we do know from the jurisprudence relating to order of precedence clauses is that you have to look very closely at both of the pertinent clauses because you're throwing one out and you have to see are they apples to apples and these are not apples to apples. Ours was much more specific. It spoke expressly in terms of pricing, saying that the pricing would be different, and it was later in time, reading all of that together. And then we have Ms. Fraser's testimony saying, had she known it, that she would have called timeout and called us in for negotiations. That sounds like you made a unilateral mistake, not that it was a mistake by both parties, but that you made a unilateral mistake, a mistake which she presumably would regard as unreasonable as well as wrong. And so if the issue had been squarely raised, she would have told you, no, you have to get the dirt off site. Well, I disagree, Your Honor. That's what she tells me about it. It was squarely raised. It was raised in our proposal. It was raised in the technical volume, but your argument implicitly is that your price proposal and the cost volume was conditioned on a condition not mentioned in the cost volume, but mentioned in the technical volume. That's right. I don't think that's reasonable. You can't condition a price term on something that's not in the cost volume. Everything relating to cost has to be in the cost volume. No, the language that Your Honor is referring to in the solicitation documents about the limitation on pricing information says you may not quote price terms or make quotations of terms related to pricing. Is this a term related to pricing? There's no dollar value. There's no schedule of dollars. What it's saying is, hey, hold on. I asked you this question twice, orally and in writing, pre-proposals. You didn't answer. So I'm telling you, I base my proposal on using this material that's on site. In the cost volume? No, we did that in the technical proposal. Well, that's why we're having a problem. My understanding of the law is that everything relating to cost has to be highlighted by having it in the cost volume, not buried in the technical proposal volume. Well, there was an instruction. I don't think it rises to a rule of law, but perhaps it is in the FAR. I'm not sure about that point. It is undisputed that there is language in the solicitation documents that cautions offerors to refrain from including pricing terms or quoting terms related to pricing in the technical volume. But that's where you put it, and you didn't put it in the cost volume. There was no place to put it in the cost volume. Sure there was. You could have said, we propose to vary the part from the solicitation by using on-site dirt, and if you let us do that, the price will be $3 million. If you force us, as per the solicitation, to get off-site dirt, in that event, our offered price is $4 million because it's going to cost us more. But you didn't do that. You gave one price with no express condition. Your Honor, had ADT done what you're suggesting should have been done Probably would have lost the bid. We would have been, yeah, that's right. We would have lost, and we arguably, I think we would have been very close to submitting something that was out of compliance with the form that was solicited. That's very dangerous stuff. The government had, for an offeror, a government contractor, has to think very long and hard before doing that. The offeror here did put it in, and the government had an opportunity to reject our proposal on the basis of technical insufficiency. The real issue is a technical issue. Can you or can't you use this on-site material to fill the depression so we can get this building built? And that's a technical issue. With major cost implications. That's the very reason you're suing for the difference. You're suing for several hundred thousand dollars. What was that? That was the added cost to go truck the dirt from somewhere else. So it does relate to cost as well as physics. I'm not suggesting it doesn't relate to both. What I'm saying, though, is the government had an opportunity. It was a technical issue and had an opportunity, and what it said was it reserved the right to do all sorts of things. It could negotiate with us. But that's the very reason it doesn't get reviewed, isn't it? It's because it's in the technical volume. That's the sort of thing you deal with downstream, maybe, when you're making technical alterations. But it didn't affect the cost, according to the government, and so it was a technical matter for later, right? No. Respectfully, there's allegations in briefing that this was why it got missed. There's no evidence that's why it got missed. It got missed because the government granted it. It's the reason for what I take to be the rule of law that cost-determining things be mentioned in the cost volume. Otherwise, it's going to be missed, just as it was here. So you hung yourselves by putting it in the wrong place and not being clear. Well, with respect, I think we were clear. It became part of the contract, and so what we have here is— I suppose your answer might be everything in the technical volume is cost-determinant. Absolutely right. Everything. Number of staffing, level of staffing. Do I have a senior project manager or a project manager? Do I hire URS as my design team lead in their rate structure or some other company? I mean, it goes on and on and on. All right. Well, let's hear from the government. Mr. Kanellis? May it please the Court. Good afternoon, Your Honors. This one is easy. Don't be so sure. Easy. Mr. Kanellis, let's see how easy it is. We gave Mr. Rawls a bit of a hard time. We certainly don't want you to feel neglected. So let me ask you a few questions. How many contracts do you think were involved in this case? There was one contract, Your Honor. One contract. They made an offer. They made an offer, and that offer is contained at page 276 of the appendix. And on that offer form it states that we agree to perform this contract at the price specified below in strict accordance with the terms of this solicitation. They certainly did sign that form, but they also put in their offer document itself. That form, by the way, was a separate form. They put right in their offer the following sentence. We assumed a on-base borrow area was available. That's a statement of fact, a statement. Actually, it's a term of their offer. Well, let me ask you this.  No, Your Honor. And the reason, the sentence that succeeds the sentence that you just read is a question, is this correct? No. That comes after the statement. That's right. I'm sorry. I thought you said it precedes it. I'm sorry. They made a statement. We assumed a on-base borrow area was available, period. That's a statement of fact. That is a question, Your Honor.  You think that's a question? It's absolutely a question. That's contained on page 276 of the appendix. I'm looking at page 8 of your brief in which you quote it. Okay. And it ends with a period. The next sentence says, is this correct, or will a borrow site off the base be required, ending with this funny little squiggle thing that I think we call a question mark? That's clearly a question.  The first sentence is a statement of fact. And if we go to page 276 of the appendix, and that's where the statement is located, we can see that ADT submitted this form, and at the top of the form it states questions. And it lists eight continuous questions, the last of which is this question. The section at the end of the technical proposal is entitled Assumptions slash Remaining Questions. And then beneath that, Your Honor, page 276 of the appendix, ADT typed in questions when we go to that page. We're not going to decide this on the basis of headings, are we? We're going to decide this on the basis, I assume, of whether we have a contract and what does that contract say. Absolutely, Your Honor. They made an offer. Did they make an offer? They did indeed, Your Honor. In that offer, they agreed to comply with the terms of the solicitation. But they also said that we are basing our offer on on-site borrow area. So they said two different things. Does the government have any responsibility to read the offer? Absolutely, Your Honor. Was the government aware that there was a problem in the offer? No, not the technical team, Your Honor, because the technical team's evaluation, and the responsibilities are contained on pages 251 and 252 of the appendix, was only to ascertain whether or not the technical application was reasonable and responsive and was not material deficient. And responsive to the RFP. That's correct. Was the offer that said we're assuming that we have on-site dirt responsive to the RFP from the viewpoint of its technical characteristics? Was that responsive to the RFP, counsel? It was not a material deficiency, Your Honor. It was not? No, Your Honor. How about if they had said, we'll be glad to do this for the RFP price, but we really don't want to do it at Nellis Air Force Base. We'd rather do it at Langley in Florida. We can build that building much easier for everybody. So we'll do it in Langley. Would the technical team have said, oh, we don't need to worry about that? I would hazard a guess that that is not a materially compliant response, Your Honor. But as Judge Mischel pointed out, if ADT for a moment believed that this was a condition that would affect its price, this would be contained in the pricing statement. You said this was not a material variance. What's your basis for making that statement? Well, because, Your Honor, it did not affect, it did not deviate from the technical requirements of building the F-22 munitions facility. It did? No, Your Honor. How about if they said, we're going to build it out of cardboard? Then obviously that would be a material deviation. How about if they said, we're going to take one of your other buildings apart and use that as the material for this building? Well, Your Honor, that would be a material deviation. In this case, they said, we're going to use your dirt. Are you discriminating against dirt and buildings? I disagree with that characterization, Your Honor, because they plainly understood when they signed the offer form, there had been no notice of change issue. They understood that they were to perform the contract in strict accordance with the terms of the solicitation. Well, yeah. Let me point something out. Reading from your very own brief, you had a very good brief, by the way. I want to congratulate you. But your brief makes a very good case for them. Here's the problem I have with it. In May of 2003, pre-proposal, before any proposal was made, they asked this question. CORE's contract specialist received an email from ADT with a list of questions, one of which was the following. Is there a site area on the base that we can use dirt from? That was pre-proposal in May of 2003. In the proposal itself, in June of 2003, they put in this sentence, we assumed an on-baseball area was available. Well, they didn't get any reply either from their first question or from that. The next thing that happened was in July of 2003, the CORE issued a notice. But on July 17th, the contracting officer's representative sent an email to the project manager, Mr. Tillman, that ADT was inquiring about use of on-base borrow. That's the third notice to the government that there's a problem with the offer. The fourth notice came in October of 2003. On or about October, the 99 CES coordinator for the project, Mr. Brown, sent an email to Mr. Weber that stated, among other things, also ADT is looking for some area for select fill. We briefly touched on that, and that was followed by an email to the AECC project manager seeking Mr. Long's response to ADT's proposal to level nearby sites for a lay-down area. And guess what? He replied by asking some Mr. Musgrave if this isn't something that could be done. And then finally in the fall of 2004 is when you got around to actually doing the dirt. The government had five opportunities before the actual losses occurred. At the request of ADT, tell us what we're doing here, and the government had noticed even before the first offer was made by them that they wanted to include that as a term of the contract, and they did. What is the government's duty in looking at the technical specifications? The government's duty, Your Honor, is delineated on page 252 of the appendix. And on page 252, and actually the end of page 251, it delineates the technical team's responsibilities in this solicitation. And the technical team's responsibilities were to review the technical proposal, solely the technical proposal, to see if it comported with the terms of the solicitation. And one of the terms of the solicitation was use off-site dirt? One of the terms of the solicitation was no borrow or spoil. The unequivocal statement, no borrow or spoil areas are available on base. That was a term? That was a term. Did they comply with that term in their offer? Well, it's not a matter of compliance. That put them on notice that there was no way to comply with that term, Your Honor, because until performance began, there was no way to test whether or not they were actually in compliance with that term. Let's assume the government was fine. The government didn't make a mistake. Let's assume they made a mistake, a unilateral mistake. Is there any remedy for a unilateral mistake? Ordinarily, there is a remedy, and that is reformation, Your Honor. However, as we noted in our brief, where there has been contract performance, then that remedy has been waived. So in this case, now ideally, Your Honor, I concede in a better world, the Army would have been more diligent about responding with respect to the question proposed by ADT. I'm glad you said that because was this a small business? Yes, it was, Your Honor. And what are the implications of being a small business contract? In what respect, Your Honor? Why is it called a small business contract? Do they get some kind of consideration for being a small business? This was a small business solicitation, Your Honor, so all of the bidders in this case received whatever. But what is the advantage of being a small business? I'm sorry, Your Honor. You lose quicker by being a small business than you do if you're a big business? As part of being a small business, you gain certain advantages that are mandated by statute, which are not at issue here. Like some consideration, perhaps, from the Army? Well, Your Honor, I think that whatever the consideration of the Army, if the Army deviated from the requirements delineated on pages 251 and 252 of the appendix, then you would have another protest. In fact, we wouldn't be inviting the other bidders in this case to come in and protest because the Army gave an exception to ADT for its failure to read the basic provision on the face of the contract, that no borrow or spoil air. They didn't fail to read it. They just ignored it. Well, they ignored it. They did more than ignore it. They expressly revoked it. And then they have no basis for an entitlement to say that we were allowed to continue digging in the dirt for on-base spill. On-base spoil air is given their failure to understand a very basic provision of the contract. Okay. Perhaps Your Honor is right. This wasn't so easy. But I think that the contract language is very explicit. Did you say earlier that you conclude that the contractor waived the right to any recovery because they performed the contract? Well, that is the law as we have cited to it in our brief, Your Honor, yes. Because ordinarily if this issue were raised prior to contract completion, then yes, then we would have the ability. We'd have a bid mistake, and we would have fought this a lot earlier than we did, and we would be able to reform the contract. But what you asserted is that performance creates waiver. I don't understand that. Because we cannot reform the contract if there is a bid mistake. No, but you can pay compensation for an equitable adjustment for the excess cost that they incurred by having to go get the dirt elsewhere. That's the very relief they're asking for. So why do you say that because they completed the contract, they've obviously waived any claim to be compensated? Because the remedy for a bid mistake, Your Honor, is narrowed reformation. Their view is that they didn't make a mistake. They made an offer to negotiate a change which the government accepted. And therefore, the contract as altered by their proposed departure on the location of the dirt was accepted by the government. And therefore, they are entitled to use on-site dirt, and yet you force them to use off-site dirt. Your Honor, if there was a notice of change in this case which put everyone on notice that on-base dirt was available, then I think that argument would apply. There was no notice of change. I'm not making an argument. I'm trying to understand your argument, which was that by performance they necessarily waived any claim to compensation. Well, I think, Your Honor, my response was in context of the ordinary remedy for mistake of bid, which is reformation. Yeah, but they don't say they made a mistake. Their argument is they didn't make a mistake. They varied the terms of a contract in their proposal, and their proposal on their term was accepted. And yet, despite the government accepting it, the government turned around and rejected it and made them get the dirt off-site. And that argument, Your Honor, is not plausible because they signed. There was no notice of change with respect to the off-site dirt. The notice of change is the duty of the contracting officer under the FARC. That has nothing to do with what they proposed and what the government accepted. Well, their proposal, Your Honor, was not a proposal. It cannot be construed as a proposal because it was an open-ended question that stated price will be affected if off-site soils are going to be required in this case. That is not an offer, Your Honor. It's too open-ended to be an offer. And, in fact, as you yourself noted, if this was intended as an offer, it would have been reflected in the pricing proposal of ADT. It was. It was not. They lowered their price because they assumed they were going to use on-site dirt. Your Honor, it wasn't this condition that they attached. The so-called condition that they attached to their proposal did not in any sense indicate to the government that there was an alternative price that would be charged. They submitted their pricing form. They submitted their price form without any reference whatsoever to this alleged condition that they now claim. Well, you're making it sound like the people who review the technical side of this thing aren't part of the government, the same government, but the people who receive the contract price thing. Now, I understand that the technical people are told, don't worry about price because that's not your problem and we don't want you influenced by contract price so that you shouldn't shave the technical requirement. You just look to see if it's technically correct. That's right. But that's only because that's their little piece of the job. That doesn't mean that the government isn't the big contracting party in the sky that's dealing with all of this. These are not isolated worlds. The technical people and the contracting officer ought to be talking to each other. Now, in this case, they did not. Your Honor, my time has expired. May I respond to your question? May he respond to my question? I may. It must. Thank you. Your Honor, in fact, in the solicitation in this case, on page 251 of the appendix, it prohibits the pricing, the technical people from providing information to the pricing people. And the reason is because you want those two factors pursuant to the terms of the solicitation were to be reviewed independently. And that is why there was no communication with respect to the… Is there some law that prohibits the contracting officer from reading the technical proposal? Is there some law? There was a – the contracting officer read the technical proposal after the pricing information was presented, Your Honor. And the contracting officer didn't go… Well, Your Honor, given that the – given the plain language on page 58 of this joint appendix, which states that no borrow soil or soil areas are available on base, and given that ADT did not, subsequent to the contract, until May of 2004, indicate any contractual – believe that it had any contractual right to use on base soil or borrow areas, no, the contracting officer believed that ADT wouldn't sign the offer for it. What about the question? They kept asking, can we use on base fill, and they couldn't seem to get an answer. Isn't there some obligation on the part of the contracting officer or some subordinate to answer the mail, answer the question, clarify the problem? There is a – as I said, Your Honor, I would – perhaps we wouldn't be here if they had been more responsive. There is no obligation, and this is on page 252… Of the joint appendix. Of the joint appendix, and that is where the responsibilities are delineated, and it states – and it gives the technical team an opportunity to respond, but it does not mandate it. So that is – everyone was put on notice that just because ADT asked questions doesn't mean that it's going to necessarily get answers. Well, if the contracting officer did read the technical volume as well as the cost volume, then why didn't she answer the question? Because, Your Honor, when ADT submitted the offer form, which states that it agrees to perform the contract in strict accordance with the terms of this solicitation… This doesn't make any sense to me if this is a negotiated type of contract which allows for departing from terms that are in the solicitation. But the negotiations were not required in this case, Your Honor. It was a – there was an opportunity to negotiate. However, if their proposal was… Were they permitted in this type of solicitation to propose departures from the strict requirements of the solicitation? No, Your Honor. They were not allowed to, and in fact, in the paragraph that delineates the ability of the technical team to respond to these questions but does not mandate it, it states that… I don't care about the technical team. I'm trying to figure out why the contracting officer didn't answer the question. Your Honor, we – that – the record is not – is absent with respect to the rationale. The Army just missed it. However, the Army was not obligated to respond. There was no obligation to respond, and ADT bears the responsibility of reading the terms of the solicitation. We agree… Is it your view that they were not allowed to change anything in the solicitation? I still can't understand it. No, no, no. It's not that they weren't allowed to change anything in the solicitation, Your Honor. However, if there was a change in the solicitation pursuant to Bar 12.206 or 15.206, that notice of change must have been published to the other offerors as well so that they could amend their proposals. Yeah, because that provision directs the contracting officer to do so. But that doesn't answer the question of where is the contractor left if they make a clear variation and their proposal, as they've worded it, gets accepted. Well, the contracting – the bidder – every bidder must, before it submits an offer saying that it's going to comply with the strict terms of the solicitation, bears an obligation to read the solicitation, Your Honor. Of course. They did read it. As the court of compliance did. And they proposed a variance. And the government apparently accepted the variance. The government did not accept the variance, Your Honor. It was not a proposal. It was a question. And it was a question that at best sought clarification. And the government – because it was open-ended, as the board found – the government did not believe at the time. And ADT, as the board found, a finding which was supported by substantial evidence, ADT itself did not believe that it had a contractual right to use on base fill. Your position then is that the Army dropped the ball but, like the Ravens, had no obligation to score. Is that right? That is correct, Your Honor. I'm a Dolphins fan, but yes, that is a fair analogy. Do you think the government dealt fairly with this contractor? Yes, Your Honor. I do. I think that the government could have done a better job in responding. How poor a job can they do without consequence? Well, I think that depends upon the terms of the solicitation and the law of this circuit. And the law of this circuit requires that if a – the language of a contract says what it means, it means what it says. That doesn't help us because the contract has conflicting terms. These are not conflicting terms, Your Honor, because ADT acceded. First of all, that assumes the conclusion that ADT's question was any sort of definitive condition. Well, they did everything they could except shoot off a rocket and picket the White House. Let me read to you just from your own brief for a minute. On July 17, 2003, the contracting officer's representative, Mr. Weber, sent an email to the project manager, Mr. Tillman, that ADT was inquiring about use of an on-base borrow. ADT had shown Mr. Weber the assumption-slash-question language in its proposal. Mr. Weber possessed an opinion on the meaning of the assumption-question but wanted a separate interpretation. Mr. Tillman, in turn, asked an in-house attorney from the Corps for his opinion of the meaning of the assumption-question in ADT's proposal. There is no record that the attorney from the Corps ever responded with an opinion on the meaning of the assumption-question. And then you have a footnote indicating that you invoked the attorney-client privilege in front of the board to keep them from knowing anything more about this. I mean, that's a sorry record. That is a very sorry record for the government, don't you think? Your Honor, I again concede that I wish the government had been more responsive. But the issue in this case is what is the contract? The government isn't even responsive to itself. When one government officer asks another one a question, he can't get an answer either any more than the contractor can get an answer. I don't disagree that the government could have performed better in this case, Your Honor, but the issue— The issue is what is the contract? What is the contract? And they made you an offer which you accepted, but nobody seems to want to admit to the fact that nobody quite knew what that offer was. And the—well, I disagree with that, Your Honor. When they submitted the offer, they submitted—they signed the form which stated that they agreed to comply with the solicitation. No, no, no, some change was issued. And accordingly, the government understood at that time that they—that ADT agreed to perform with all the terms, including the term at page 58 of the appendix, which is the no borrowers clause. Is there some other box on the form that says I don't agree to do it the way the solicitation says? I'm suggesting some variations, some departures from the requirements of the solicitation? ADT had that opportunity, Your Honor. They did not. You're not answering my question. Did the form provide an alternative box from 17 to be checked by the contractor that wants to propose a departure from the requirements of the solicitation? I don't believe that it did, Your Honor. So ADT's option— So any contractor then has to check box 17 and then be as clear as they can that they want to propose a departure. So in that event, it's not 17 that saves you. It's that they weren't clear enough in proposing their departure. Well, it is—17 is the problem, Your Honor, because if they did not want to accept the offer as the solicitation terms, they should not have signed the block saying that we agree to comply with the solicitation terms. Well, as I understood it from opposing counsel, if they don't sign that, their bid won't even be read, won't be considered at all. No, that's not true. The signature of ADT's president was May 11, 2003. That was when they submitted the offer form in which they agreed to comply with the terms of the solicitation. If they wish to propose an amendment, it was their obligation to propose an amendment and seek a notice of change from the government so that all parties—and so it was fair to all parties bidding on this contract so they could all—the rules could be applied to all parties equally. All right. Well, we certainly understand your position. Mr. Rawls, you're going to have two minutes for rebuttal. I hope you don't feel neglected. Thank you, Your Honor. I appreciate it. Thank you, Your Honors. Just a couple of points that came up. There was a discussion of remedy when it comes to full performance. I think rescission may be a remedy that is unavailable after full performance but not reformation. I think that is the distinction there and potentially an important one if that is the grounds for relief or mistake. Mr. Kanellis pointed out quite ably— You don't want the contract reformed. You say the contract was favorable to you. You just want it enforced. Correct. Correct. I was just responding to that point. Fair enough. On JA253, which is after the off quota JA252, we have more discussion of what it is that the technical team is supposed to do. 3.2.2 says they are to clearly identify any required clarifications citing reference and locations. If anything in the proposal is unclear or confusing, note it as a required clarification. Mr. Tillman testified under oath. When I asked him, did you do all of what 3.2.2 called for, he answered yes. And then, Your Honor, there are a number of places in the solicitation documents that speak of what kinds of things can be proposed, and I would draw the Court's attention respectfully to JA50, which is among those submission requirements. It says the solicitation criteria rely upon industry standards as much as possible to allow the offeror a degree of design flexibility while meeting certain specific project requirements. That is the kind of thing that allows, in addition to the FAR language that talks about what a contracting officer is to do if he or she likes something that's in an RFP or in a proposal. And what we have at the bottom is an IFB-type mentality and lack of communication brought to a negotiated procurement to this small contractor. Non-communication by the government and muddy communication by you. It's a mess all the way around. Well, we'll take the case under advisement. Thank you, Mr. Chairman. Thank both counsel.